## STANLEY STEEN v. STATE.

No. A-10517.   March 20, 1946.
(167 P. 2d 375.)

142

E. P. Hill, W. J. Hulsey, and Geo. L. Hill, all of McAlester, for plaintiff in error.

Randell S. Cobb, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., and Tom G. Haile, Co. Atty., Pittsburg County, of McAlester, for defendant in error.

BAREFOOT, J. Defendant, Stanley Steen, was charged jointly with Mose Johnson with the crime of murder, in Pittsburg county; was granted a severance,

tried, convicted and sentenced to death by electrocution. From this judgment and sentence, he has appealed.

The Governor of the state, in compliance with 22 O. S. 1941 § 1003, requested of this court an advisory opinion of the Judges in this case. Thereafter, and on April 18, 1944, defendant filed his appeal in this court. Subsequent thereto, the case was set for oral argument; was argued, and briefs for both the defendant and the state have been filed. It now becomes the duty of this court to pass upon the appeal. In re Opinion of the Judges, 54 Okla. Cr. 103, 14 P. 2d 956; In re Opinion of the Judges, 35 Okla. Cr. 39, 248 P. 350.

The defendant was charged jointly with Mose Johnson by information with the killing of Pat Riley in the State Penitentiary at McAlester on December 13, 1943. The deceased was employed as a sergeant of the guard at the State Penitentiary, and the defendant was an inmate of the Penitentiary.

The facts with reference to the killing were as follows:

On December 13, 1943, the deceased, Pat Riley, was making an investigation of certain crimes that had been committed by inmates of the penitentiary within the walls, and one of which was reports that an inmate by the name of L. C. Smalley had been hijacked. There had been some indication that the defendant and his co-defendant, Mose Johnson, were involved. Between 2:30 and 3 o'clock in the afternoon, the deceased went to the compressor room of the ice plant, within the walls of the penitentiary, for the purpose of seeing the defendant and Mose Johnson. Several witnesses testified to what happened. There was some conflict of minor details, and some witnesses saw and heard statements made that others did not hear and

see. But most of the testimony was uncontradicted, and each witness corroborated the other as to the main facts.

Deceased told the defendant and Johnson that he wanted them to go with him to the sergeant's office, and the defendant said, "No, we are not going with you, you have made your last pinch here, you old flat-footed . . . . . . . ., you have made your last pinch here." The deceased was then attacked by both the defendant and Johnson. The defendant had a long-bladed knife that had been made in the penitentiary, and Johnson had some kind of an iron instrument, presumably a hammer. The deceased was hit by Johnson with the hammer, and cut and stabbed with the knife by the defendant.

Dr. E. P. Davis, who examined the body, testified as follows:

"Q. Later in the afternoon did you again see him (Pat Riley)? A. I saw his body in the afternoon. Q. Was he at that time dead? A. He was. Q. Where did you see the body? A. In the surgical room of the prison hospital. Q. Did you make an examination of the body to determine its condition? A. I did. Q. State what your examination showed? A. At that time I made a written description of the wounds. This was made at 3 p.m. Description of the wounds found on the body of Pat Riley, who expired at 3 p.m., this date. Two inch incised superficial wound at the junction inner third of left clavicle. Three inch— Q. Pardon me, Doctor, 'clavicle' means jaw bone? A. No, this bone is here, Judge (indicating). Three inch incised wound mid-chin extending into mouth, last three-fourths inch cut through. Bruise over right eye. Incised stab wound one inch in diameter, two inches deep, four inches from left spinal column at level of ninth rib. Heavy bruise and broken skin at mid-temple region just above nose. Incised wound to bone, palmar surface of left thumb. Slight incised wounds on palmar surface of third, fourth and fifth fingers left hand at the tips. Also slight

incised wounds dorsal surface of left hand just between thumb and index finger. Incised wound to bone on index finger and slight cut on fourth and fifth finger, palmar surface, right hand. And that was all."

On cross-examination:

"Q. Doctor Davis, refer to your notes, if you please, and tell the jury how many knife wounds there were on the body? * * * A. I counted twelve incise wounds."

After deceased had been cut and hit and was dead, defendant said, "Let's put him in the boiler and burn him up." They carried the body to the steps leading down to the boiler room, and Johnson said, "No, we can't do that, he is too big"; and defendant said, "Let's leave him here and go get the other . . . . . . . ." Both the defendant and his codefendant Johnson left the compressor room and went to the canteen, which was about 75 feet distance. They entered the canteen, where L. C. Smalley, an inmate, was working. Two witnesses were in the canteen at the time and saw them enter in a hurry, and go to where Smalley was working. The clothing of both was bloody and a long knife was seen by the witnesses in the pocket of defendant. They immediately attacked Smalley, and Mose Johnson hit him with an iron instrument which the witnesses could not describe, and defendant cut and stabbed him a number of times with the knife he had. Defendant stabbed Smalley after he had been knocked down by Johnson. Smalley died from the effects of the wounds inflicted. The defendant and Johnson immediately left the canteen by the door they had entered, and were encountered by the guards, who had been called to the scene. Johnson came out of the canteen fighting and was knocked down by one of the guards, and lay upon the ground, feigning death. The defendant was hit on the head by one of the guards with a walking stick, and the

next lick hit him on the arm and knocked the knife which he had in his hand to the ground. The defendant said, as he came out of the canteen, "I'll kill every God-damn one of you." Just at this time the guard at the east gate fired two shots, and the defendant gave up and was taken in custody by the guards. A hammer was found lying by the body of Johnson where he had dropped it when he fell to the ground.

It is unnecessary to give further details. A period of only a few minutes elapsed between the killing of Riley and the killing of Smalley. The distance from the compressor room to the canteen was about 75 feet. Defendant interposed a defense of insanity.

A number of witnesses who had known defendant while in the penitentiary, and some who had known him before, testified relative to his actions and conduct at different times, and on the date of the killing, and that from such actions he, in their opinion, was insane. Members of his family testified that his father had been subject to "spells," and that when they began to come on him he would tell the members of the family to leave home, for fear he would kill some of them. They would go into the woods and stay until they learned he had recovered. None of them had ever seen the father in one of the "spells." It was also shown that defendant's mother had been sent to the insane asylum at Vinita, Oklahoma, on June 17, 1936, and remained there for a period of ten months.

Dr. Herbert A. Wilson, called by defendant, testified in answer to hypothetical questions propounded by counsel for defendant and the state. His answers as to whether he was of the opinion that defendant was insane were not very satisfactory.

The state in rebuttal placed upon the witness stand

a number of employees at the penitentiary who testified that from their observation of defendant, and his acts and conduct, that he was not, in their opinion insane at the time of the commission of the crime.

The court, by proper instructions, presented the question of insanity to the jury. No exceptions were taken thereto. The jury, after considering all of the evidence, found the defendant guilty and assessed the death penalty. They did not find the defendant insane, as they could have done under the instructions of the court. However, if there had been error in the instructions, we would not hesitate to consider them even though no exceptions were taken thereto.

It is contended by defendant that the admission of evidence of the killing of L. C. Smalley was error, for the reason that it permitted a crime other than the one for which defendant was being tried to be proven. It is contended that since the defendant admitted the killing of Riley, and entered a plea of insanity, that it was error to admit this evidence. The record does not reveal that the defendant admitted the killing of Riley. He entered a plea of not guilty, and upon this plea being entered, it became the duty of the state, under the law, to prove the commission of the crime as charged in the information.

The statement of the case, as above outlined, clearly reveals that the killing of Riley and of Smalley were so closely related that all of the facts in the killing of Riley necessarily involved proof of the killing of Smalley. It comes within the rule of being a part of the res gestae. The facts as above related show that the killing of Riley had hardly been consummated until defendant declared the intention to "get" Smalley, and they then proceeded in a run to the canteen where he was working, not to

exceed a distance of 75 feet, and Smalley was attacked and killed in a very similar manner to the killing of Riley. These facts come clearly within the rule of res gestae as announced by this court in numerous decisions. Austin v. State, 28 Okla. Cr. 73, 228 P. 1113; Sango v. State, 52 Okla. Cr. 359, 5 P. 2d 400; Skelley v. State, 64 Okla. Cr. 112, 77 P. 2d 1162; Coppage v. State, 76 Okla. Cr. 428, 137 P. 2d 797; Frazee v. State, 79 Okla. Cr. 224, 153 P. 2d 637; Feil v. State, 81 Okla. Cr. 133, 161 P. 2d 770; Green v. State, 81 Okla. Cr. 282, 163 P. 2d 554, 556; People v. Prantikos, 164 Cal. 113, 127 P. 1029; State v. Nordmark, 84 Kan. 628, 114 P. 1068.

In the case of Austin v. State, supra, the court said [28 Okla. Cr. 73, 228 P. 1114]:

"The cutting of the Gibson girl by the defendant occurred very shortly before deceased received his fatal stab. It was a part of the same transaction and explanatory of the motive of the defendant in cutting and killing the deceased. It is competent to show the actions, conduct, and general demeanor of the defendant immediately preceding the killing for the purpose of proving that she was armed and in a vicious humor; provided that such conduct is so near to the time of the homicide as to tend to show the state of mind of the defendant at the time of the killing. In this instance, we think this evidence is clearly a part of the res gestæ, and the mere fact that it incidentally tended to show the commission of another offense in the stabbing of the Gibson girl did not render it inadmissible if for other reasons it was competent. Williams v. State, 4 Okla. Cr. [523] 524, 114 P. 1114; Hampton v. State, 7 Okla. Cr. 291, 123 P. 571, 40 L.R.A., N.S., 43; McLaughlin v. State, 18 Okla. Cr. 627, 197 P. 717; 2 R. C. L. 21, p. 517."

And in the case of State v. Nordmark, supra, the court said [84 Kan. 628, 114 P. 1070]:

"Nor was there error in admitting the testimony of Dr. Decker, the coroner, in regard to the condition of the bodies of Lindahl and his children. It is insisted that

testimony as to the children had no bearing on the charge of killing Lindahl, and was necessarily prejudicial to appellant. The shooting according to the testimony was a single and continuous transaction, as all the Lindahls appear to have been killed at practically the same time and by the same means. The testimony as to the children not only assisted in showing how the killing was done, but it also tended to show the plan and purpose of the accused in committing the crime charged. The fact that evidence which tends toward proving an accused guilty may also tend to prove the commission of another offense does not render it inadmissible. State v. Calhoun, 75 Kan. 259, 88 P. 1079; State v. Hansford, 81 Kan. 300, 106 P. 738; State v. Chance, 82 Kan. 388, 108 P. 789, 27 L. R. A., N. S., 1003 [20 Ann. Cas. 164]."

Under these decisions this evidence was clearly admissible, as not only being a part of the res gestae, but as strong evidence as to the state of mind of the defendant and the existence of a scheme, plan or conspiracy to kill both of these parties.

We have re-examined the cases of Johnie Williams v. State, 68 Okla. Cr. 348, 98 P. 2d 937, and the case of State v. Lapage, 57 N. H. 245, 24 Am. Rep. 69, cited in the Williams Case and relied upon by the defendant in this case. These cases are clearly distinguishable from the instant case. In the Williams Case, the offenses offered to be proven were over a year in one instance, and over seven months in the other, prior to the time of the alleged offense, and in the Lapage Case a difference of four years existed. In each of these cases, there was no connection between the two crimes. The Williams Case recognized the principle here announced, when it was said [68 Okla. Cr. 348, 98 P. 2d 939]:

"Evidence of a different offense from the one charged is admissible when both offenses are so closely linked or connected as to form a part of the res gestae.

"Evidence of other offenses is competent to prove the specific offense charged when it tends to establish a systematic scheme or plan embracing the commission of two or more offenses so related to each other that proof of one tends to establish the other, or to connect the defendant with the commission of the offense charged."

The same is true of the case of Byers v. State, 78 Okla. Cr. 267, 147 P. 2d 185, cited by defendant.

The contention of the defendant that the county attorney should have, at the time of the admission of the testimony of the killing of Smalley, stated to the court the reason for the admission of this testimony, and that the court should have instructed the jury as to the purpose for which it might be considered, has to some extent heretofore been discussed. Defendant overlooks the fact that this testimony was a part of the res gestae, and for this reason admissible. It was not admitted to show the commission of another crime, but, as above stated, to show the state of mind of the defendant, and that he was in a vicious humor at the time of the killing of the deceased Riley, and as proof of a plan or scheme of defendant and his codefendant to kill both of these parties.

Counsel for defendant complains of error of the court in refusing to give certain requested instructions which contain the above contention. In the brief filed by the state, our attention is called to the fact that these requested instructions were not filed until February 22, 1944. The instructions of the court were given on February 3, 1944. These requested instructions were filed 18 days after the verdict had been rendered, and four days after sentence had been pronounced. The motion for new trial does not contain any reference to any requested instructions. However, as these requested instructions appear in the record and are marked "Refused", by the district judge, we have

carefully examined the same, especially in view of the fact that this defendant was given the death penalty.

Requested instruction No. 1 was purportedly refused for the reasons heretofore stated. The evidence of the killing of Smalley was so closely related to the killing of the deceased Riley, that it was admissible as a part of the res gestae, as hereinbefore stated, and it was not necessary that an instruction be given explaining the reason for the admission of this evidence.

The contention that this evidence should only have been admitted on rebuttal, as covered by the second requested instruction, is untenable in view of what has heretofore been stated. This refused instruction directed the jury to disregard the evidence of the killing of Smalley because it was not introduced on rebuttal, but as direct evidence. It is our opinion that the court did not err in refusing this requested instruction.

The third requested instruction was with reference to the question of insanity, which was fully covered by the general instructions given by the court. We have carefully examined the instructions given by the court and they fully and fairly presented the issues as justified by the evidence of the state and the defendant, and no exceptions were taken to any of the given instructions.

The defendant having received a death sentence in this case, we desire to call attention to 22 O .S. 1941 § 1005, which provides:

"If, after his delivery to the warden for execution, there is good reason to believe that a defendant under judgment of death has become insane, the warden must call such fact to the attention of the county attorney of the county in which the prison is situated, whose duty it is to immediately file in the district or superior court of such

county a petition stating the conviction and judgment and the fact that the defendant is believed to be insane and asking that the question of his sanity be inquired into. Thereupon, the court must at once cause to be summoned and impaneled from the regular jury list a jury of 12 persons to hear such inquiry."

Under this section, provision is made for a proper investigation as to the sanity of one prior to his execution; and as we stated in the recent case of Bingham v. State, 82 Okla. Cr. 5, 165 P. 2d 646, 656:

"The Governor of the state, likewise, has power to appoint expert alienists to observe the defendant and make an inquest into his sanity."

We now recommend such action be taken by the Governor before the execution of this sentence is carried out.

Finding no error, the judgment of the district court of Pittsburg county is affirmed.

The original time for execution of the judgment and sentence having expired, owing to the pendency of this appeal, it is considered, ordered and adjudged that the judgment and sentence of the district court of Pittsburg county be carried out by the electrocution of this defendant on the 31st day of May, 1946.

JONES, P. J., concurs. DOYLE, J., not participating.